**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| DAVID MICHAEL BROWN | |
| Appellant | No. 209 MDA 2014 |

Appeal from the Judgment of Sentence December 30, 2013
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0007803-2011

BEFORE:  ALLEN, J., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.:                                  **FILED JULY 30, 2015**

David Michael Brown appeals the judgment of sentence entered December 30, 2013, in the York County Court of Common Pleas.  The trial court imposed an aggregate sentence of eight to 16 years' imprisonment, after Brown was convicted, in a non-jury trial, of persons not to possess firearms, receiving stolen property, and possession of a controlled substance.[1]  On appeal, Brown contends the trial court erred in denying his pretrial motion to suppress evidence recovered during a traffic stop, because the officer who detained him had no jurisdiction to do so.  For the reasons set forth below, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6105 and 3925, and 35 P.S. § 780-113(a)(16), respectively.

The trial court aptly summarized the testimony presented during the suppression hearing as follows:

On … September 30, 2011, [West Manchester Township] Detective [David] Bixler was coordinating with the York City Police Department on a DUI checkpoint located on Roosevelt Avenue. Detective Bixler stated that he was parked on the north/west corner of the intersection of Fahs Street and Roosevelt Avenue. The checkpoint was scheduled to be active between the hours of 11:00 p.m. and 3:00 a.m. The jurisdictional boundary between West Manchester Township and York City runs down the center of Roosevelt Avenue. Accordingly, the west side lane of Roosevelt Avenue is in West Manchester Township and the east side lane of Roosevelt Avenue is in the City of York.

During his testimony, Detective Bixler indicated that at approximately 2:54 a.m., the officers conducting the checkpoint had begun to tear down the signs and cones that marked the checkpoint to oncoming drivers. As this was occurring, Detective Bixler, who was in a patrol car at the location stated above, heard a vehicle approaching on Kelly Drive, which is located in York City. The Detective stated that he could hear the vehicle coming before he saw it due to the noise from the squealing of tires. Detective Bixler indicated that from his position he could see [Brown's] vehicle slide through the intersection of Kelly Drive and Fahs Street, although he could not state exactly the moment that he observed the vehicle in relation to the stop sign at that intersection. He did state, however, that he was convinced [Brown] did not stop due to the manner in which [his car] "slid through" the intersection. Detective Bixler, concluded, therefore, that he had observed a traffic violation, which had occurred within York City, albeit just a short distance from his position in West Manchester Township. Detective Bixler indicated concern, due to hearing the squealing of tires and the previous sliding though the intersection by [Brown], that [Brown] presented a danger to the officers who were on foot at the checkpoint area and who were attempting to tear it down. He indicated that he radioed to them of the approach of [Brown's] vehicle because of its apparent unsafe operation.

Detective Bixler then observed [Brown] proceed the short distance along Fahs Street from Kelly Drive to Roosevelt Avenue,

whereupon [Brown's] vehicle came to a full stop at the intersection of Fahs and Roosevelt.[2] The officer did not testify as to the distance from Kelly Drive to Roosevelt. By referencing Commonwealth's Exhibit Number One, a map of the area which was admitted into evidence, the distance from Kelly Drive to Roosevelt Avenue is approximately 40-50 meters. Detective Bixler then saw [Brown] turn left onto Roosevelt Avenue, proceeding in a southerly direction within the lane of Roosevelt Avenue that lies within the jurisdiction of West Manchester Township, at which time the Detective activated his emergency lights and siren and pursued [Brown]. However, [Brown] did not stop in response to the officer placing his lights and siren on. As they approached the area of the checkpoint, Detective Bixler testified that he could hear the other officers along this stretch of road who were picking up signs and cones yelling at [Brown] in an effort to get him to stop his vehicle When he observed [Brown] was not going to stop his vehicle voluntarily, Detective Bixler nudged [Brown] off the road with his police cruiser. When the vehicle came to rest, 6-8 officers descended quickly on [Brown's] vehicle and ordered him out of the car. Detective Bixler indicated that [Brown], prior to getting out of the vehicle, made a furtive movement toward the center console of the vehicle, whereupon one of the officers opened the vehicle door and pulled [Brown] out of the vehicle.

Subsequently, a 40 caliber semi-automatic hand gun was recovered from the center console of the vehicle toward which [Brown] had been reaching when making his furtive movement. Upon searching [Brown] incident to apprehension, three (3) partial sandwich baggies were found by Detective Bixler in [Brown's] left rear pocket, one of which contained small white chunks of a substance which appeared to be cocaine. A field test was performed on the substance, the results of which were positive. At this time, [Brown] was placed into a patrol car and

_____

[2] After viewing Detective Bixler's dash-cam video of the incident at a reconsideration hearing, the trial court stated that Brown did not come to a complete stop at the intersection of Fahs Road and Roosevelt Avenue, but rather came to a "rolling stop" through that intersection and left his turn signal on as he continued straight down Roosevelt Avenue toward the checkpoint. N.T., 1/30/2013, at 7.

was advised of his Miranda rights. Inside [Brown's] wallet were several stacks of bills in $100.00 packs, which Detective Bixler knew to be a common way of keeping money amongst drug deals. In addition, the vehicle was impounded and in plain view on the drivers rear seat was a marijuana roach.

Order, Findings of Fact and Conclusions of Law, 10/5/2012, at 5-7.

Upon further investigation, the officers learned (1) Brown was a convicted felon, and, accordingly, prohibited from possessing a firearm, and (2) the handgun recovered from his vehicle had been reported stolen by its owner in October of 2009. Therefore, Brown was charged with persons not to possess firearms, receiving stolen property, and possession of controlled substances. On February 21, 2012, Brown filed an *omnibus* pretrial motion seeking suppression of the drugs and gun recovered from his vehicle on the following bases: (1) Detective Bixler had no jurisdiction to stop Brown's vehicle; (2) Detective Bixler improperly stopped Brown's vehicle without reasonable suspicion or probable cause; and (3) Brown was arrested absent reasonable suspicion or probable cause. *See Omnibus* Pre-Trial Motion, 2/21/2012, at §§ I-III. A suppression hearing was conducted on March 23, 2012, and the trial court took the matter under advisement. On October 5, 2012, the court entered an order denying Brown's motion to suppress, concluding, *inter alia*, that the officer had jurisdiction to arrest Brown pursuant to 42 Pa.C.S. § 8953(a)(2) ("Where the officer is in hot pursuit of any person for any offense which was committed … within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense.").

On December 12, 2012, Brown filed a motion to reconsider his suppression claim based on after-discovered evidence, namely the dash-cam video from Detective Bixler's patrol car. Brown asserted that the dash-cam video confirmed that the detective observed Brown commit a traffic offense **outside of his own jurisdiction** and then effectuated a stop and arrest **inside his jurisdiction**, in contrast to the trial court's findings. *See* Motion to Reconsider Order Dismissing Omnibus Pre-Trial Motion Based Upon After-Discovered Evidence, 12/12/2012, at ¶¶ 14-16. The trial court granted the motion to reconsider and conducted a re-hearing on January 30, 2013, at which time the court viewed the dash-cam video. Nonetheless, on May 14, 2013, the court entered an order dismissing the motion for reconsideration.

On November 22, 2013, after a non-jury trial, the court found Brown guilty of the above-listed offenses. Brown was sentenced on December 30, 2013, to an aggregate term of eight to 16 years' imprisonment,[3] and this timely appeal followed.[4]

---

[3] The trial court imposed a sentence of five to 10 years' incarceration for the charge of persons not to possess firearms, a consecutive term of one and one-half to three years for the charge of receiving stolen property, and a consecutive one and one-half to three years for the charge of possession of a controlled substance.

[4] On February 10, 2014, the trial court directed Brown to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). After trial counsel was permitted to withdraw and new counsel was appointed, Brown filed a concise statement on April 21, 2014. Furthermore, we note the appeal was initially dismissed by this Court on September 18,
*(Footnote Continued Next Page)*

On appeal, Brown argues the trial court erred in denying his pre-trial motion to suppress because Detective Bixler's actions violated the Statewide Municipal Police Jurisdiction Act ("MPJA"), 42 Pa.C.S. §§ 8951-8954.[5] First, Brown contends Detective Bixler did not witness a crime committed within the detective's primary jurisdiction. Consequently, his subsequent pursuit of Brown was not authorized under Section 8953(a)(2). *See* Brown's Brief at 15-16. Second, Brown asserts the detective was not on "official business" in York City at the time he observed the traffic violation, and Brown's actions did not "pose an imminent threat of danger," so that Detective Bixler's pursuit and vehicle stop was not authorized under Section 8953(a)(5). *Id.* at 17. Because Detective Bixler had no jurisdiction to stop or arrest him, Brown argues the evidence recovered during the vehicle stop should have been suppressed.

When reviewing an order denying a pre-trial motion to suppress evidence, we are guided by the following:

> We are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We may consider the evidence of the witnesses offered by the prosecution, as verdict winner, and only so much of the defense evidence that remains

(Footnote Continued)

2014, when Brown neglected to file a brief. However, on November 10, 2014, this Court reinstated the appeal upon motion of Brown.

[5] Brown has not renewed the claims raised in his initial suppression motion arguing that his vehicle stop and subsequent arrest were not supported by reasonable suspicion or probable cause.

uncontradicted as a whole. We are bound by facts supported by the record and may reverse only if the legal conclusions reached by the court below were erroneous.

***Commonwealth v. Borovichka***, 18 A.3d 1242, 1248-1249 (Pa. Super. 2011).

Pursuant to the MPJA, a police officer is empowered to act outside of his primary jurisdiction in certain limited circumstances:

(a) General rule.--Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:

* * * *

(2) Where the officer is in hot pursuit of any person for any offense which was committed, or which he has probable cause to believe was committed, within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense.

* * * *

(5) Where the officer is on official business and views an offense, or has probable cause to believe that an offense has been committed, and makes a reasonable effort to identify himself as a police officer and which offense is a felony, misdemeanor, breach of the peace or other act which presents an immediate clear and present danger to persons or property.

42 Pa.C.S. § 8953(a)(2), (5).

Here, the trial court determined Detective Bixler had jurisdiction to stop Brown's vehicle on two bases. First, following the initial suppression hearing, the trial court found Detective Bixler was authorized to stop Brown's

- 7 -

vehicle pursuant to Section 8953(a)(2). The court explained: "It is well-settled that where an officer observes a defendant in his primary jurisdiction and believes him to have committed an offense or crime in that jurisdiction, he may follow the defendant and effectuate an arrest outside of his primary jurisdiction." Order, Findings of Fact and Conclusions of Law, 10/5/2012, at 11-12.

However, as Brown correctly states in his first issue on appeal, "[t]he case *sub judice* presents the antithesis of what [Section] 8953(a)(2) allows." Brown's Brief at 15. Section 8953(a)(2) permits an officer to make a stop or arrest when he has probable cause to believe a defendant **committed a crime in his primary jurisdiction**, **but his pursuit of the defendant leads him into another jurisdiction**. Here, Detective Bixler, while sitting in a police car within his primary jurisdiction, West Manchester Township, observed Brown commit a traffic offense in another jurisdiction, York City. Thereafter, Detective Bixler pursued Brown, after Brown entered the detective's primary jurisdiction, West Manchester Township, and stopped him in that same jurisdiction.

This Court's decision in **Commonwealth v. Boyles**, 104 A.3d 591 (Pa. Super. 2014), is dispositive. In that case, a Slippery Rock University Police Officer conducted a traffic stop of Boyles after the officer clocked him speeding. During the stop, the officer suspected Boyles of driving while intoxicated, and ultimately charged him with DUI. The trial court, however, granted Boyles's motion to suppress based on a purported illegal stop, and

this Court affirmed on appeal. This Court concluded the officer had no jurisdiction to stop Boyles. Although the road on which Boyles was speeding was abutted on both sides by the college campus, the officer's jurisdiction was limited to "property that is owned by the university." *Id.* at 596. Therefore, a panel of this Court stated:

> Because the purported Motor Vehicle Code violation did not occur within [the officer's] primary jurisdiction, the "hot pursuit" provision of the MPJA is unavailable. *See* 42 Pa.C.S.A. § 8953(a)(2). Absent more, [the officer] had no authority to stop [Boyles's] vehicle for a Motor Vehicle Code violation that occurred outside the officer's primary jurisdiction.

*Id.*

The same is true here. Detective Bixler observed Brown commit a motor vehicle violation in York City, outside of the detective's primary jurisdiction. He then proceeded to stop Brown after Brown traveled into the detective's primary jurisdiction. Accordingly, we agree with Brown that Section 8953(a)(2) did not provide Detective Bixler with jurisdiction to stop Brown's car.[6]

---

[6] We note the Commonwealth also contends Detective Bixler was acting within his primary authority, pursuant to 42 Pa.C.S. § 8952, when he stopped Brown. For the reasons that follow, we disagree.

First, the Commonwealth asserts Detective Bixler was authorized to investigate and arrest criminals in York County "by virtue of his appointment as a special detective with the Office of the York County District Attorney." Commonwealth's Brief at 12. We decline to find jurisdiction on this basis, particularly because there is very little information in the record concerning Detective Bixler's appointment and duties. Indeed, during the Commonwealth's redirect examination of Detective Bixler at the
*(Footnote Continued Next Page)*

Nonetheless, the trial court also concluded Detective Bixler's stop of Brown was authorized pursuant to Section 8953(a)(5).[7] We agree.

*(Footnote Continued)* ————————————

reconsideration hearing, the prosecutor showed him a document and asked him what it was. *See* N.T., 1/30/2013, at 13-14. Detective Bixler replied, "It was when I was reappointed as a special county detective with the District Attorney's Office." *Id.* at 14. The prosecutor followed-up by asking, "Have you ever been unappointed or has it ever expired?" to which the detective responded, "No." *Id.* Lastly, the prosecutor asked, "So, you are technically still under the county detective?" to which Detective Bixler responded, "That's correct." *Id.*

The document presented to Detective Bixler is not part of the certified record on appeal, and based solely upon the above testimony, it is unclear what duties or responsibilities Detective Bixler might have had as a "special county detective." Accordingly, the record does not support a determination that the detective had jurisdiction to investigate crimes in York City.

Additionally, the Commonwealth argues Brown's actions on Roosevelt Avenue, after he entered West Manchester Township, constituted erratic driving, and could have supported a charge of fleeing and eluding, such that Detective Bixler would have had probable cause to stop Brown within his primary jurisdiction. Commonwealth's Brief at 14-16. However, Detective Bixler's testimony at the suppression hearing does not support the Commonwealth's contention that Brown's actions, for the short time he was on Roosevelt Avenue in West Manchester Township, justified a vehicle stop. *See* N.T., 3/23/2013, at 9-10.

[7] Although the trial court did not specifically cite this subsection in its opinion following the reconsideration hearing, it is clear, based on the language in the opinion, that the court found subsection (a)(5) applicable. *See* Order, 5/14/2013, at 1 ("[W]e find that the way that [Brown] was driving this vehicle constituted a threat to public safety and that he posed an immediate clear and present danger to the officers located within the checkpoint area."); 2 ("Detective Bixler had the authority to stop and arrest [Brown] based upon violations observed while he was on **official business** outside of the detective's primary jurisdiction.") (emphasis supplied).

As noted above, Section 8953(a)(5), empowers a police officer to enforce the law outside of his primary jurisdiction when "the officer is on **official business and views an offense**, … and makes a reasonable effort to identify himself as a police officer and which offense is a felony, misdemeanor, breach of the peace or other act **which presents an immediate clear and present danger to persons** or property."   42 Pa.C.S. § 8953(a)(5) (emphasis supplied).

Brown contends, however, that (1) Detective Bixler was not on official business in York City when he observed the traffic offense, and (2) his own actions "did not pose a clear and immediate risk."   Brown's Brief at 19-20. He cites the Supreme Court's decision in **Martin v. Commonwealth, Dept. of Trans., Bureau of Driver Licensing**, 905 A.2d 438 (Pa. 2006), for the proposition that an officer is not considered to be on "official business" within a neighboring jurisdiction when his only reason for being there is the pursuit of the defendant for a possible offense that occurred in his primary jurisdiction.   Brown's Brief at 18.   Furthermore, Brown argues the testimony did not support a finding that he was driving at a "high rate of speed" or "erratically" when he approached the checkpoint, but rather, established that he "successfully navigated through the coned area before slowing down and pulling over to the side."   *Id.* at 20.   Lastly, Brown claims that even if the police acted in good faith, the only remedy is suppression of the evidence. *Id.* at 19, *citing* **Commonwealth v. Bradley**, 724 A.2d 351 (Pa. Super.

- 11 -

1997) (*en banc*), *appeal denied*, 743 A.2d 913 (Pa. 1999). We will address these contentions *seriatim*.

First, as noted above, the trial court found Detective Bixler was on "official business outside of the detective's primary jurisdiction" when he observed the violation. Order, 5/14/2013, at 2. We agree.

On the night in question, Detective Bixler was working as part of a "joint DUI checkpoint with York City." N.T., 3/23/2012, at 5. The detective stated officers from both West Manchester Township and York City were monitoring the checkpoint. He explained, "We sign a multi-jurisdictional pact. We conduct traffic stops on their side. They conduct on our side." ***Id.*** at 26. Furthermore, at the reconsideration hearing, the Commonwealth presented a stipulation that if the police chief of York City were called to testify, he would state, "that consent was given in this case for this operation for [West Manchester officers] to act inside York City's jurisdiction." N.T., 1/30/2013, at 15. Accordingly, although Detective Bixler was technically within his primary jurisdiction at the time he observed Brown commit the offense, he was authorized, pursuant to the multi-jurisdictional pact, to stop vehicles in York City.[8] Moreover, because we find

_____

[8] We emphasize that Brown's offense was clearly observed by Detective Bixler from the position he was stationed during the multi-jurisdictional checkpoint. The detective stated, "They always station a patrol unit at either end of the line in case there's an incident where somebody runs the line and it's your responsibility to go after them." N.T., 3/23/2012, at 24. Therefore, we need not determine whether Detective Bixler would have been authorized
*(Footnote Continued Next Page)*

- 12 -

Detective Bixler was on "official business" in York City separate from his pursuit of Brown, we conclude **Martin**, **supra**, is distinguishable from the case *sub judice*.

We also agree with the trial court's determination that Brown's actions posed an "immediate clear and present danger" to the officers dismantling the checkpoint. 42 Pa.C.S. § 8953(a)(5). After viewing the dash-cam video from the night in question, the court stated: "The video backs up one hundred percent [the] prior testimony of Detective Bixler."[9] N.T., 1/30/2013, at 22. Specifically, the court found that Brown's car "slid through the intersection at Kelly and Fahs Drive." *Id.* The trial court further explained:

> You could visually see the g-forces having impact on that car as it slid through the intersection, and the way you can see that is ever so slightly the headlights tilt to one angle as a car does when it's going around a corner very fast[.]

*Id.* Moreover, the court noted that Brown then slowed, but did not come to a complete stop, at the corner of Fahs and Roosevelt Avenues, before

_____
*(Footnote Continued)* ————————

to patrol York City in an area away from the DUI checkpoint, and make an arrest based on an observed violation.

[9] We note the dash-cam video tape was not included in the certified record on appeal, and "it is the appellant's duty to 'ensure that the certified record is complete for purposes of review.'" **Commonwealth v. Little**, 879 A.2d 293, 301 (Pa. Super. 2005), *appeal denied*, 890 A.2d 1057 (Pa. 2005). Nevertheless, as Brown does not rely upon his interpretation of the dash-cam video in his argument, we find our review is not hampered by this omission.

turning onto Roosevelt and traveling toward the checkpoint with his left turn signal still on.  *Id.* at 23-24.  The trial court stated:

> The officers in that video looked like they were about to break down the traffic stop area because it was a very narrow area with the orange traffic cones on it, and there were at least three officers that were immediately standing by traffic cones, my point being there was no wiggle room here.  This was a very narrow area with officers within inches of the traveled area that [Brown's] vehicle went in.

*Id.* at 24-25.  The court's observations of the dash-cam video support Detective Bixler's testimony that he was concerned for the officers' safety.[10] *Id.* at 11.

Accordingly, we conclude the record supports the trial court's finding that Detective Bixler had the proper authority, pursuant to Section 8953(a)(5), to stop Brown for a motor vehicle violation that occurred outside the detective's primary jurisdiction.  Although Detective Bixler was stationed in West Manchester Township when he observed the violation, he was on "official business" as part of a joint DUI checkpoint, and was authorized to make arrests in York City.  42 Pa.C.S. § 8953(a)(5).  Further, he clearly observed Brown run a stop sign and continue into the officer's primary jurisdiction, without yielding to the officer's command to stop.  Detective Bixler justifiably feared for the safety of other officers who, at that time,

_____

[10] During the initial suppression hearing, Detective Bixler testified there were "approximately 25 officers out on the street" assisting with the DUI checkpoint.  N.T., 3/23/2012, at 9.

were dismantling the DUI checkpoint on the roadway, such that Brown's actions presented "an immediate clear and present danger to persons or property." *Id.* Therefore, the trial court properly denied Brown's motion to suppress.

Furthermore, we note that even if we were to conclude that Officer Bixler was in **technical violation** of the MPJA, we would still affirm the order of the trial court. Indeed, in **Commownealth v. Chernosky**, 874 A.2d 123, 129-130 (Pa. Super. 2005) (*en banc*), *appeal denied*, 902 A.2d 1238 (Pa. 2006), an *en banc* panel of this Court held that a violation of the MPJA does not result in the automatic exclusion of evidence. Rather,

> suppression of evidence may or may not be the appropriate remedy for a violation of section 8953 of the Act, depending upon all of the circumstances of the case including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the Act, and the prejudice to the accused.

*Id.*, *quoting* **Commonwealth v. O'Shea**, 567 A.2d 123, 130 (Pa. 1989), *cert. denied*, 498 U.S. 881 (1990).[11] The **Chernosky** Court emphasized "[th]e purpose of the MPJA is to proscribe investigatory, extraterritorial forays used to acquire additional evidence where probable cause does not yet exist." *Id.*

We find this Court's decision in **Commonwealth v. Henry**, 943 A.2d 967 (Pa. Super. 2008), *appeal denied*, 959 A.2d 928 (Pa. 2008), instructive.

---

[11] The *en banc* decision in **Chernosky** appears to overrule the prior *en banc* decision in **Bradley**, **supra**, which Brown relies upon herein.

In that case, a South Greensburg police officer on routine patrol observed the defendant's car run a stop sign at an intersection located in neighboring Hempfield Township. The officer initiated a traffic stop and detected a strong odor of alcohol. The defendant was subsequently arrested and charged with DUI. *Id.* at 968. The trial court, however, determined that the intersection where the violation occurred was not within the officer's primary jurisdiction, and suppressed the evidence recovered during the traffic stop.

On appeal by the Commonwealth, a panel of this Court acknowledged that the arresting officer was in technical violation of Section 8953(a)(5) of the MPJA because (1) he was not on "official business" in the neighboring jurisdiction at the time he witnessed the offense, and (2) there was no evidence the defendant presented a "immediate clear and present danger to persons or property." *Id.* at 971. The court also noted that the arresting officer neglected to follow proper procedure by "maintaining the *status quo* … until officers from the appropriate jurisdiction arrive[d]." *Id.* Nevertheless, the **Henry** Court held suppression of the evidence was not the appropriate remedy. The Court reasoned:

> [T]he arresting officer in this case entered the Pennsylvania State Police's jurisdiction after determining he had probable cause to stop appellee for violating the Motor Vehicle Code. If appellee had run the stop sign while traffic was heavy, the officer would have arguably been authorized by section 8953(a)(5) to enter the State Police's jurisdiction. 42 Pa.C.S.A. 8953(a)(5) (providing that extraterritorial pursuit is warranted when, *inter alia*, an officer has probable cause to believe a suspect has committed any "act which presents an immediate clear and present danger to persons or property."). The stop sign appellee

- 16 -

ran was within the officer's ordinary patrol route, although the sign was located outside the officer's jurisdiction. Indeed, if the officer had been present in the intersection at the point in time when appellee ran the stop sign, he would have been on "official business" in the State Police's jurisdiction and would have been authorized to pursue appellee until detention. [*Commnonwealth v.*] *Lehman*, [870 A.2d 818,] 821 [Pa. 2005].

While there is no question the officer failed to follow the appropriate procedure after detaining appellee, there is no indication within the record this failure was volitional. Furthermore, this failure did not prejudice appellee in that it was presumably immaterial to him as to whether he was detained by a South Greensburg Police officer or a Pennsylvania State Police trooper—the end result would have been identical.

In conclusion, the arresting officer did not enter the State Police's jurisdiction to conduct an extraterritorial patrol or to embark on a fishing expedition in hopes of gathering more evidence to reach a determination of probable cause. *Chernosky*, *supra* at 130; *cf. Martin*, *supra* at 447–448. To the contrary, the officer was on routine patrol in his own jurisdiction when he determined he had probable cause to initiate a traffic stop. The officer was in technical violation of the MPJA; however, this violation was unintentional and, when viewed in light of all the circumstances, does not warrant the application of the exclusionary rule. The suppression court's ruling "impose[s] an unreasonable burden on the police and endow[s] the criminal with an incredible advantage." *Eisenfelder, supra* at 154.

*Id.* at 972-973.

The facts in the present case are even more compelling than those in

*Henry*. Detective Bixler was authorized to conduct vehicle stops in York City

pursuant to the multi-jurisdictional DUI checkpoint. Indeed, if Brown had

appeared to evade the checkpoint, there is no question that Detective Bixler

would have had jurisdiction to conduct a vehicle stop in York City. Here, as

in *Henry*, any perceived violation of Section 8953 was "unintentional" and

not designed to "embark on a fishing expedition in hopes of gathering more evidence to reach a determination of probable cause." **Id.** at 973. Accordingly, even if Detective Bixler's actions were not specifically authorized by Section 8953, we conclude Brown is entitled to no relief.

Judgment of sentence affirmed.

Judge Allen joins this memorandum.

Judge Strassburger files a concurring statement.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/30/2015